## STATE OF CONNECTICUT *v.* LOUIS SANTIAGO
### (AC 28185)

DiPentima, McLachlan and Dupont, Js.

Argued April 24—officially released August 28, 2007

*Cyd O. Oppenheimer*, special public defender, with whom were *George G. Kouros*, and, on the brief, *Richard A. Reeve* and *Michael O. Sheehan*, special public defender, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, former state's attorney, *Sandra L. Tullius*, senior assistant state's attorney, and *Chris A. Pelosi*, assistant state's attorney, for the appellee (state).

*Opinion*

McLACHLAN, J. The defendant, Louis Santiago, appeals from the judgment of conviction, rendered after

a jury trial, of felony murder in violation of General Statutes § 53a-54c, robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-134 (a) (2), and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (2). On appeal, the defendant claims that (1) the trial court improperly failed to instruct the jury on the credibility of accomplice testimony, (2) the state's prosecutorial improprieties during closing arguments deprived him of his due process right to a fair trial[1] and (3) the court violated his constitutional right to confrontation under the sixth amendment to the United States constitution by refusing to allow a witness to articulate before the jury that witness' reason for refusing to testify at trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Late in the evening of October 8, 2001, Pamela Torres drove her boyfriend, Marcos Jimenez, from their residence in New Britain to the defendant's residence in Meriden. When they arrived, the defendant and Michael Jimenez, the brother of Marcos Jimenez, were on the porch in front of the residence. A short time later, they were joined by Justin Cross. Sometime around midnight, Cross suggested that they all drive to the Nelton Court housing project in Hartford to acquire drugs. Torres agreed to drive.

When they arrived at the housing project in the early morning hours of October 9, 2001, Torres drove into

---

[1] After the parties filed their appellate briefs, our Supreme Court rendered its decision in *State* v. *Fauci*, 282 Conn. 23, 917 A.2d 978 (2007), in which it concluded that the term "prosecutorial impropriety" is more appropriate than the traditional term "prosecutorial misconduct." Id., 26 n.2. Although the parties have briefed the defendant's claim utilizing the nomenclature of prosecutorial misconduct, we use the term "prosecutorial impropriety" in our analysis of the defendant's claim.

the parking lot and stopped in the vicinity of a parked car occupied by two individuals. Leroy Collier, sitting in the driver's seat, had been selling packets of "angel dust"[2] from his car. William Adams, sitting in the front passenger seat, had joined Collier at some point in the evening and was attempting to sell him some compact discs. Marcos Jimenez exited Torres' vehicle and approached Collier, who rolled down the car window. As they were talking, the defendant, Cross and Michael Jimenez left the backseat of Torres' vehicle. The defendant, holding a shotgun, proceeded to the driver's side of Collier's vehicle and pointed the weapon at Collier's head. Adams opened the passenger door, raised his hands above his head, stated that he had nothing and started to walk away from the vehicle. Cross, armed with an AK-47, told him to stop and then shot him. As Adams fell to the ground, Cross instructed Michael Jimenez to check his pockets. Adams only had compact discs on his person.

Cross then returned to Torres' vehicle. Michael Jimenez moved over to the driver's side of Collier's vehicle. The defendant, still pointing the shotgun at Collier, told him to get out of the car. Collier opened the door and stood directly in front of it. The defendant told Collier to give him everything in his pockets, and Collier turned over some packets of angel dust and approximately $40. The defendant told Michael Jimenez to check Collier's pockets, but he found nothing. At that point, the defendant shot Collier in the abdomen and Collier fell backward into the car. Torres, along with the defendant, Cross, Marcos Jimenez and Michael Jimenez, drove away. Collier was later transported to a hospital and recovered from his injuries. Adams, however, had been fatally wounded.

The defendant was arrested and charged with felony murder, assault in the first degree, robbery in the first

---

[2] "Angel dust" is also known as phencyclidene or PCP.

degree, attempt to commit robbery in the first degree and conspiracy to commit robbery in the first degree. The case was tried before the jury in September, 2003, but the court declared a mistrial when the jury was unable to reach a verdict. The case was retried before a jury in June and July, 2004, with the same judge presiding. At the second trial, the jury heard testimony from Collier, the surviving victim, and, among others, Torres and Marcos Jimenez. Michael Jimenez, when called as a witness for the defense, invoked his fifth amendment right against self-incrimination.[3] Cross, who had testified at the first trial, refused to testify at the second trial. His behavior, outside of the presence of the jury, was so disruptive at the second trial that the court found him in contempt and had him removed from the courtroom. Defense counsel requested that Cross make his refusal to testify before the jury, but the court denied that request and simply told the jurors that Cross was an unavailable witness because of his refusal to testify. The transcript of his testimony at the first trial was read to the jury.

At the conclusion of the second trial, the jury returned a verdict, finding the defendant guilty of all of the crimes charged except assault in the first degree. As to that charge, the jury found the defendant not guilty. The court accepted the verdict and sentenced the defendant to a total effective term of forty-five years incarceration. This appeal followed.

I

The defendant first claims that the court improperly failed to instruct the jury on the special considerations applicable to accomplice testimony with respect to Torres, Cross and Marcos Jimenez. Because the defendant failed to preserve his claim by requesting such a charge

---

[3] Michael Jimenez had similar charges pending against him in connection with the incident on October 9, 2001.

or by objecting to the charge as given, he seeks review under the plain error doctrine set forth in Practice Book § 60-5.

"The plain error doctrine is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . The plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Smith*, 275 Conn. 205, 239–40, 881 A.2d 160 (2005).

"Whether in the interest of justice we notice this failure to give the accomplice instruction as plain error depends in part on whether the failure was harmful. The failure to give the accomplice instruction would be harmful only if the absence of this instruction was likely to have affected the jury's verdict. . . . Because the failure to give the accomplice instruction does not involve the violation of a constitutional right, it is the defendant's burden to show its harmfulness." (Citation omitted.) *State* v. *Brown*, 187 Conn. 602, 613, 447 A.2d 734 (1982).

The state has conceded that an accomplice witness instruction should have been given with respect to the testimony of Cross and Marcos Jimenez[4] but claims that

[4] "[W]here it is warranted by the evidence, it is the *court's duty* to caution the jury to scrutinize carefully the testimony if the jury finds that the witness intentionally assisted in the commission, or if [she] assisted or aided or abetted in the commission, of the offense with which the defendant is charged. . . . [I]n order for one to be an accomplice there must be mutuality of intent and community of unlawful purpose." (Citation omitted; emphasis

the court's failure to do so was not harmful to the defendant. The state does not make that concession with respect to the testimony of Torres because she never was charged with any crimes in connection with the incident on October 9, 2001. Further, the state claims that no evidence was presented that indicated Torres was aware that the purpose in going to the Nelton Court housing project was to commit a robbery rather than to purchase drugs.

We will assume for the purposes of the defendant's argument that the court should have given the accomplice witness instruction with respect to the testimony of all three witnesses. In determining whether that failure to instruct was harmful, we consider the factors set forth in *State* v. *Patterson*, 276 Conn. 452, 886 A.2d 777 (2005). Those factors include: "(1) the extent to which [the witness'] apparent motive for falsifying his testimony was brought to the attention of the jury, by cross-examination or otherwise; (2) the nature of the court's instructions on witness credibility; (3) whether [the witness'] testimony was corroborated by substantial independent evidence; and (4) the relative importance of [the witness'] testimony to the state's case." Id., 472. Applying those factors to the present case, we conclude that the court's failure to instruct the jury specially as to the witnesses' motivations for testifying was harmless.

With respect to the first *Patterson* factor, the defendant, through his counsel, clearly brought to the attention of the jury the apparent motives of Torres, Cross

in original; internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 227, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

"Because of the various motives an accomplice may have for falsifying his testimony, the jury should, where the evidence so warrants, be admonished to scrutinize that testimony with particular care in light of any such disclosed or undisclosed, but apparent, motives." *State* v. *Ruth*, 181 Conn. 187, 196, 435 A.2d 3 (1980).

and Marcos Jimenez to testify falsely during his cross-examination of those witnesses and during his closing arguments to the jury. Torres, although she had not been charged with any crimes in connection with the incident on October 9, 2001, may have been concerned that charges would be brought if she did not cooperate with the state in its prosecution of the defendant. Moreover, charges were pending against her boyfriend, Marcos Jimenez, at that time, and she may have hoped that her testimony would be helpful to him. Those possible motivations of Torres to testify falsely were all brought to the attention of the jury by defense counsel. Although Torres testified that the state had made no promises to her concerning her testimony, the jury was free to discredit that testimony if it chose to do so.

Cross, although he had already pleaded guilty to charges in connection with the death of Adams and had been sentenced to a term of twenty-eight years incarceration, admitted during his cross-examination[5] that he knew that the state could facilitate a request for sentence modification to reduce the amount of time that he would have to serve. During closing arguments, defense counsel again raised the motivation of Cross to testify against the defendant in order to obtain a sentence modification.

At the time of the defendant's second trial in June, 2004, Marcos Jimenez, who had refused to testify during the defendant's first trial, was facing charges of felony murder, attempt to commit robbery and conspiracy to commit robbery in connection with the incident on October 9, 2001. Those charges had been brought after September, 2003, the time of the defendant's first trial. During cross-examination, he was asked whether he

[5] As previously noted, the transcript testimony of Cross from the first trial was read before the jury in the second trial. The defendant was represented by the same attorney in both trials.

expected that his cooperation with the state during the defendant's second trial would result in favorable treatment in connection with his pending charges. He responded that he did not. During closing arguments, defense counsel again emphasized to the jury the apparent motive of Marcos Jimenez to falsify his testimony because he was facing the uncertain disposition of those serious charges.

Accordingly, with respect to the first consideration, the jury was well aware that the three witnesses had motives for falsifying their testimony. Defense counsel, during the cross-examination of Torres, Cross and Marcos Jimenez, and in his closing arguments, clearly brought those motives to the attention of the jury.

With respect to the second *Patterson* factor, the court's instructions included an admonition that the jury should consider any possible motive, bias or personal interest of a witness when evaluating the credibility of that witness.[6] Further, the court instructed the

---

[6] The court instructed the jury on witness credibility, in part, as follows: "As you weigh the testimony of the witnesses, consider the probability or improbability of their testimony. Consider their appearance, conduct and demeanor while testifying in court, and any interest, bias, prejudice or sympathy or lack of interest, bias, prejudice or sympathy which a witness may apparently have for or against the state or the accused or in the outcome of the trial. . . .

"You should harmonize the evidence as far as it can reasonably be done. Use all of your experience, your knowledge of human nature and of the motives which influence and control human conduct, and test the evidence against that knowledge. In short, bring to bear upon the testimony of the witnesses the same considerations and use the same sound judgment that you apply to questions of truth and veracity as they present themselves to you in everyday life.

"You are entitled to accept any testimony which you believe to be true and to reject, either wholly or in part, the testimony of any witness you believe has testified untruthfully or erroneously. The credit you will give to the testimony offered is, as I've told you, something which you alone must determine. Where a witness testifies inaccurately and you do or don't think the inaccuracy was consciously dishonest, bear that in mind and scrutinize the whole testimony of that witness. The significance you attach to it may vary more or less with the particular fact to which the inaccuracy existed or with the surrounding circumstances."

jury that a witness' felony conviction was a factor that the jury could weigh in assessing the credibility of that witness. It could choose to reject the testimony of a person previously convicted of a serious crime or choose to accept it, or it could choose to accept part of the testimony and reject the remaining testimony.[7] Thus, the court's instructions suggested that the testimony of those three witnesses could be viewed as suspect.

With respect to the third *Patterson* factor, the testimony of Torres, Cross and Marcos Jimenez was consistent, and those witnesses corroborated each other's testimony. Their testimony was also corroborated by the surviving victim, Collier, and by physical evidence found in the garage at the defendant's residence. There was, therefore, substantial independent evidence of the defendant's guilt.

Through Torres, Cross and Marcos Jimenez, the jury heard testimony that only the defendant and Cross had weapons, that the defendant had a shotgun and Cross had an AK-47, that the defendant shot Collier and Cross shot Adams, that Collier turned over his drugs and approximately $40 to the defendant and that nothing was taken from Adams because he had only compact discs in his pocket. Although there may have been some minor variations as to some of the details surrounding

[7] The court instructed the jury: "There was testimony here of previous felony convictions on the part of some of the witnesses. That evidence was offered and admitted for one purpose only: to address the question of the credibility or believability of those witnesses. A witness' conviction of a prior felony may be weighed by you, the jury, in testing the credibility of that witness, but for that purpose only. You may consider that, everything else being equal, you would not believe the testimony of a person who has committed a serious crime as readily as you would believe the testimony of a person of good character. But you're not required to disbelieve a witness simply because the witness has previously been convicted of a felony. It's something you may take into account in judging the witness' credibility, if you find that it bears on that credibility."

the incident on October 9, 2001, in substance, the testimony of Torres, Cross and Marcos Jimenez was remarkably consistent.

Significantly, the testimony of those three witnesses was not the only evidence inculpating the defendant. The testimony of Collier was consistent with the testimony of Torres, Cross and Marcos Jimenez.[8] His testimony was as follows. He was selling angel dust from the driver's side of his parked car in the parking lot of the Nelton Court housing project on October 9, 2001. Adams, who wanted to sell Collier some compact discs, joined him and sat in the front passenger seat. A car entered the lot at approximately 2 a.m. and parked near Collier's vehicle. A person from that car came over to him, and he rolled down his window. Shortly after that, the defendant, whom Collier identified in a photographic array several months after the incident and at trial, approached his car and pointed a shotgun at his head. Adams left the vehicle and said he had nothing. Collier heard a gunshot and, through his rearview mirror, saw Adams fall. The defendant, still pointing the gun at Collier, told him to get out of his car. While Collier was standing in front of the open driver's side door, the defendant demanded everything that he had, and Collier gave him the remaining drugs and approximately $40. The defendant called over another person and told him to check Collier's pockets. That person

---

[8] The defendant claims that Collier's testimony cannot be considered substantial independent evidence of guilt. The defendant argues that "it is apparent from the verdict that the jury did not find . . . Collier to be credible: the jury acquitted [the defendant] of assault despite . . . Collier's allegation that [the defendant] was the individual who shot him." First, "[w]e cannot speculate . . . as to how and why the jury arrived at its verdict." (Internal quotation marks omitted.) *State* v. *Smith,* 70 Conn. App. 393, 404, 797 A.2d 1190, cert. denied, 261 Conn. 924, 806 A.2d 1063 (2002). Second, the jury did find the defendant guilty of robbery in the first degree, the charge that related to the taking of the drugs and money from Collier. It appears, therefore, that the identity of the defendant was not questioned by the jury.

frisked Collier and walked away when he found nothing. At that point, the defendant shot Collier in the abdomen, and Collier fell backward into the car.

In addition to Collier's testimony, physical evidence taken from the defendant's garage also corroborated the testimony of Torres, Cross and Marcos Jimenez. Shotgun shells discovered in that garage were consistent with the pellets and material removed from Collier's abdomen during his surgery.

With respect to the fourth *Patterson* factor, although it is apparent that the testimony of the challenged witnesses was important to the state's case, their testimony was corroborated by the victim's testimony and the physical evidence as recited previously. When all of the factors are considered, we come to the conclusion that the court's failure to give an accomplice testimony jury instruction was harmless and was not likely to have affected the jury's verdict. Thus, it is unnecessary for us to notice plain error in this case.

II

The defendant next claims that the state's prosecutorial improprieties during closing arguments deprived him of his due process right to a fair trial. Specifically, he argues that the prosecutor improperly (1) expressed her personal opinion regarding the evidence presented at trial, (2) denigrated defense counsel, (3) disparaged the reasonable doubt standard and (4) mischaracterized the evidence. The defendant contends that the cumulative effect of those improprieties deprived him of a fair trial. We disagree.

"[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process

right to a fair trial. Put differently, [impropriety] is [impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] caused or contributed to a due process violation is a separate and distinct question . . . . As we have indicated, our determination of whether any improper conduct by the state's attorney violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that [impropriety] was objected to at trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 361–62, 897 A.2d 569 (2006).

As the alleged impropriety occurred during closing argument, we set forth the applicable legal principles. "Prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . [B]ecause closing arguments often have a rough and tumble quality about them, some leeway must be afforded to the advocates in offering arguments to the jury in final argument. [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Nevertheless, [w]hile a prosecutor may argue the state's case forcefully, such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Citation omitted; internal quotation marks omitted.) *State* v. *Necaise*, 97 Conn. App. 214, 229–30, 904 A.2d 245, cert. denied, 280 Conn. 942, 912 A.2d 478 (2006).

A

The defendant claims that the prosecutor improperly vouched for her view of the evidence no less than nine times during the course of her closing and rebuttal

arguments to the jury.[9] The defendant argues that by

<hr>

[9] The defendant challenges the following comments of the prosecutor:

"*The state believes* that in reviewing the evidence, you'll be as certain of this defendant's guilt as Leroy Collier was when he selected the photograph of this person, this defendant, Louis Santiago, as the person that robbed him and shot him on the night of October 9, 2001. You will find that the state has met its burden of proof." (Emphasis added.)

"The three elements that *the state believes* that it has proved beyond a reasonable doubt are: Number one, that the defendant, acting alone or with other persons, committed a robbery or attempted to commit a robbery. Two, that the death of William Adams was caused by this defendant, Louis Santiago, or by another participant, and that William Adams was not a participant in the crime. . . . Three, that the defendant or another participant caused the death of William Adams in the course of and in furtherance of the robbery." (Emphasis added.)

"[*The*] *state believes* that it has satisfied beyond a reasonable doubt [the three elements of felony murder], and we ask that you look at the evidence and recall the testimony of Leroy Cross, Marcos Jimenez, Pamela Torres and Leroy Collier, as well as looking at what the doctors told you and what Edward Jachimowicz [a firearms and toolmark examiner with the department of public safety's forensic science laboratory] told you and also what Detective [Andrew] Weaver [of the Hartford police department] told you about finding that .223 caliber cartridge case in the area where Justin Cross was standing. And, if you recall, that's the area that Marcos Jimenez pointed out is pretty much the area where that .223 cartridge case was found. In doing so, [*the*] *state believes* that you will find that it has proved beyond a reasonable doubt that the defendant is guilty of the crime of felony murder." (Emphasis added.)

"In the course of committing the robbery, the defendant or another participant must be armed with a deadly weapon and, again, if you would refer back to what I've earlier said about whether the defendant committed a robbery, *I think* you will find that he intended to take property from Leroy Collier and that he took that property from Leroy Collier by the use of force or the threatened use of physical force to prevent the resistance or overcoming by Leroy of the taking of his property." (Emphasis added.)

"And we've talked about what an attempted robbery is and, in fact, gone through a lot of what the evidence is already with regard to whether this defendant intentionally aided Justin Cross in committing the robbery of— the attempted robbery of William Adams. *I believe* that in looking at all of the evidence, you will find beyond a reasonable doubt that this defendant did intentionally aid." (Emphasis added.)

"Again, [*the*] *state believes* that if you look at the facts, you will make the determination that this defendant conspired to commit robbery in the first degree." (Emphasis added.)

"Ladies and gentlemen, I'm going to close at this point. I'll have an opportunity to speak to you again briefly, but *the state believes* that based on all

using the phrases, "I believe," "I think" and "the state believes," the prosecutor interjected her personal opinion or beliefs into the summation of the trial.

"[A] prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions. . . . It is not, however, improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . .

"Although prosecutors generally should try to avoid using phrases that begin with the pronoun 'I,' such as 'I think' or 'I believe,' we recognize that the use of the word 'I' is part of our everyday parlance and . . . because of established speech patterns, it cannot always easily be eliminated completely from extemporaneous elocution. . . . Furthermore, [t]he state's attorney should not be put in the rhetorical straightjacket of always using the passive voice, or continually

the evidence presented that you will find this defendant, Louis Santiago, guilty beyond a reasonable doubt as to each of the five crimes with which he is charged, and we ask you to find Louis Santiago guilty as charged." (Emphasis added.)

"Ladies and gentlemen, when you look at all of the evidence, you're going to see that these discrepancies do not, in fact, create doubt. In fact, to some degree they should make the testimony more credible. *I think* you'd be very suspect if all the testimony was just a cookie-cutter of the rest of what every other witness said. Again, people have their own perceptions. They tell things in the way that they saw it and what they focused on at that particular time." (Emphasis added.)

emphasizing that he is simply saying I submit to you that this is what the evidence shows . . . . *Therefore, if it is clear that the prosecutor is arguing from the evidence presented at trial, instead of giving improper unsworn testimony with the suggestion of secret knowledge, his or her occasional use of the first person does not constitute misconduct.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Luster,* 279 Conn. 414, 435–36, 902 A.2d 636 (2006).

We conclude that the prosecutor's comments were not improper.[10] It was not improper for the prosecutor to comment on the evidence presented at trial and to argue the inferences to be drawn therefrom. It is clear from a review of her comments that she was referring to the evidence and not to her personal opinion of the defendant's guilt or the witnesses' credibility. The defendant would have us focus solely on the words, "I believe," or, "the state believes," without placing them in context with the remainder of her comments that referenced the evidence presented. "The mere use of phrases such as I would think, I would submit, and I really don't think, does not transform a closing [argument] into the improper assertions of personal opinion by the [prosecutor]." (Internal quotation marks omitted.) *State* v. *Mulero,* 91 Conn. App. 509, 520, 881 A.2d 1039 (2005), cert. denied, 277 Conn. 912, 895 A.2d 792, cert. denied, 549 U.S. 862, 127 S. Ct. 149, 166 L. Ed. 2d 108 (2006).

B

The defendant next claims that the prosecutor denigrated the integrity and role of defense counsel by

[10] Because we conclude that there was no impropriety, we need not reach the second prong of the inquiry, which is whether the defendant was harmed by the alleged impropriety. See *State* v. *Necaise,* supra, 97 Conn. App. 232 n.14.

implying that his questions regarding the thoroughness and reliability of the police investigation were merely tactics intended to distract the jury from the ultimate question of the defendant's guilt. Specifically, the defendant claims that the following remarks by the prosecutor were improper: "The defendant's attorney wants you to look for doubt based on a police investigation. Once again, the old, you know the police did a lousy job, therefore, the defendant is not guilty. Well, I submit to you that is not true, and here the police did not do a lousy job."

The defendant relies on *State* v. *Luster*, supra, 279 Conn. 414, in support of his argument. In *Luster*, our Supreme Court found that it was improper for a prosecutor to impugn the role of defense counsel. "In particular, [i]t is improper for a prosecutor to tell a jury, explicitly or implicitly, that defense counsel is employing standard tactics used in all trials, because such an argument relies on facts not in evidence and has no bearing on the issue before the jury, namely, the guilt or innocence of the defendant." (Internal quotation marks omitted.) Id., 434. Here, the prosecutor's single rhetorical statement was de minimis in comparison with the remarks found to be improper in *Luster*.[11] Taken in context with the remainder of the prosecutor's comments, we conclude that no impropriety occurred.

C

The defendant next claims that the prosecutor, in her rebuttal argument, disparaged the importance of reasonable doubt with the following statements: "But

_____

[11] In *Luster*, the following remarks were found to be improper: "It seems to [have] become fashionable of late to put the police department on trial; let's try the cops. . . . [I]t's a desperate move to attack the police in a situation such as this. It's diverting attention from the real issue . . . . Putting the cops on trial is a desperate move; it tries, it tries to make you think that the cops did something wrong . . . ." (Internal quotation marks omitted.) *State* v. *Luster*, supra, 279 Conn. 433.

your job here in a trial—a trial is a search for truth. It's not a search for doubt. . . . And remember, we do not have to answer every single question that comes up in a particular case." The defendant argues that such comments undermine the state's burden of proof in a criminal trial. Assuming, without deciding, that the comment was improper, we conclude that the remark did not deprive the defendant of his due process right to a fair trial for the reasons discussed in part II E.

## D

The defendant's final claim with respect to prosecutorial impropriety is that the prosecutor, on two occasions, misstated the evidence with respect to the testimony of Marcos Jimenez as to whether he saw the defendant fire his shotgun prior to the incident on October 9, 2001. Specifically, the defendant claims that the prosecutor stated that the witness testified that the defendant fired that shotgun on previous occasions when no such evidence was presented. The defendant claims that by telling the jury that the evidence indicated that he fired the shotgun before October 9, 2001, the prosecutor invited the jury to make the inference that the shotgun belonged to the defendant, that the defendant knew how to use it and had fired it out of a car in the past, that the defendant had participated in a drive-by shooting and that the defendant had a violent or lawless disposition.

Marcos Jimenez testified at trial that he had seen the defendant with the same shotgun that he had on October 9, 2001, before the time of the incident. He further testified that he had observed the shotgun being operated. When asked for particulars, he responded: "I shot it out the car before." When questioned further, he indicated that he did not fire the shotgun but that "[i]t was shot out the car before."[12]

---

[12] The testimony at issue by Marcos Jimenez was as follows:

"[The Prosecutor]: Had you ever seen [the defendant] with this shotgun before?

During her closing argument, the prosecutor stated: "Marcos Jimenez has seen Louis Santiago shoot this very gun before, and he has seen the ammunition that Louis Santiago had in his garage at 57 Prescott Street." In her rebuttal argument, she made the following statement: "Marcos Jimenez, with regard to all of these shells, Marcos Jimenez also told you that he's seen these types of shells before. He has seen those shells in the defendant's possession and he has seen the defendant use that gun before and actually fire that gun before." The defendant claims that the prosecutor misstated the evidence, twice claiming that Marcos Jimenez saw the defendant fire the shotgun prior to the incident on October 9, 2001, when the evidence never established who had fired it on the previous occasions. The state argues that a reasonable inference can be drawn from the testimony of Marcos Jimenez that it was the defendant who had fired the shotgun. We agree that the prosecutor misstated the evidence.

"We long have held that a prosecutor may not comment on evidence that is not a part of the record and may not comment unfairly on the evidence in the record." *State* v. *Fauci*, 282 Conn. 23, 49, 917 A.2d 978 (2007). "A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to

"[The Witness]: Yes.
"[The Prosecutor]: And when you saw him with the shotgun before, had you ever seen this shotgun work?
"[The Witness]: Yes.
"[The Prosecutor]: How did you see it work?
"[The Witness]: I shot it out the car before.
"[The Prosecutor]: It was—you had actually shot it out the car?
"[The Witness]: No.
"[The Prosecutor]: Who had shot it out the car?
"[The Witness]: It was shot out the car before.
"[The Prosecutor]: It was shot out the car before. So, you knew it was a working shotgun?
"[The Witness]: Yes."

evidence. . . . The rationale for the rule prohibiting the state from making such a reference is to avoid giving the jury the impression that the state has private information, not introduced into evidence, bearing on the case." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 587, 849 A.2d 626 (2004).

Here, the prosecutor's statement that Marcos Jimenez testified that he saw the defendant fire the shotgun prior to the incident on October 9, 2001, is not accurate. Although Marcos Jimenez saw the defendant with that shotgun and the shotgun had been fired at that time, he never identified the defendant as the person who fired it. It would be speculation to conclude that the defendant fired it when there is no indication when this happened, where it happened, how many other individuals were present at the time it happened and the circumstances surrounding the firing of the shotgun. Accordingly, we conclude that the prosecutor misstated the evidence and that the statements were improper.

E

We now turn to whether the impropriety, namely, the improper introduction of a fact not in evidence and the possible undermining of the burden of proof in a criminal trial;[13] see part II C; so infected the trial with unfairness as to make the defendant's conviction a denial of due process. "In order to make this determination we consider the factors [set forth in *State* v. *Williams*, supra, 204 Conn. 540], specifically: the extent to which the impropriety was invited by the defendant's conduct or argument, the severity of the impropriety, the frequency of the impropriety, the centrality of the impropriety to the critical issues in the case, the strength of the curative measures adopted and the

---

[13] We note that the court's instructions more than adequately informed the jury of the presumption of innocence and the state's burden to prove the elements of the crimes charged beyond a reasonable doubt.

strength of the state's case." *State* v. *Camacho*, 282 Conn. 328, 382, 924 A.2d 99 (2007). After examination of all of the factors, we conclude that the defendant was not deprived of his right to a fair trial by the prosecutorial impropriety in this case.

We first note that the defendant's conduct did not invite the prosecutor's improper remarks to the jury. Second, the few instances of impropriety occurred only in her closing and rebuttal arguments, where we typically allow some latitude. Further, the remarks comprised a small portion of those arguments. Third, we do not view the statements made as "grossly egregious . . . [and] severe enough to mandate reversal." (Internal quotation marks omitted.) Id., 383. Moreover, in determining whether prosecutorial impropriety was severe, we consider it highly significant that defense counsel failed to object to the remarks when made or to request curative instructions or to move for a mistrial. See *State* v. *Fauci*, supra, 282 Conn. 51. With respect to the fourth factor, whether the defendant had fired the shotgun on prior occasions was not central to the critical issues in the case.

The fifth *Williams* factor focuses on the strength of the curative measures taken by the trial court. Because the defendant did not object to the prosecutorial impropriety, the court did not give a specific instruction directed to the improper remarks. Although this does not preclude us from reviewing the defendant's claim, the failure to object is important. The defendant "bears a significant degree of responsibility for the fact that this impropriety went uncured. . . . In addition, we note that a failure to object demonstrates that defense counsel presumably [did] not view the alleged impropriety as prejudicial enough to jeopardize seriously the

defendant's right to a fair trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Luster*, supra, 279 Conn. 445–46.[14]

Finally, the remaining *Williams* factor takes into consideration the strength of the state's case. The state's case was strong. The testimony of Torres, Cross and Marcos Jimenez was consistent as to the defendant's actions on October 9, 2001. The testimony of Collier, the surviving victim, was consistent with that of the other witnesses and inculpated the defendant. Finally, physical evidence retrieved from the garage at the defendant's residence further supported the finding of guilt. Accordingly, we conclude that in the context of the entire trial, there is no reasonable likelihood that the jury's verdict would have been different absent the sum total of the prosecutor's comments. See *State* v. *Camacho*, supra, 282 Conn. 367. Accordingly, the defendant was not deprived of his due process right to a fair trial.

## III

The defendant's final claim is that the court violated his constitutional right to confrontation under the sixth amendment to the United States constitution by refusing to allow Cross to articulate in front of the jury the

---

[14] Additionally, even though the court gave no specific curative instructions, the court reminded the jury in its general instructions following closing arguments that the statements of counsel during those arguments were not evidence: "Keep in mind that arguments and statements by counsel in final arguments or during the course of the case are not themselves evidence. You should not consider as evidence counsel's recollection of the evidence, nor their personal belief as to any facts or as to the credibility of any witness, nor any facts which an attorney may have presented to you in argument from that attorney's knowledge, which was not presented to you as evidence during the course of the trial. If there's any difference between what either counsel recalled as the evidence and what you recall as the evidence, follow your recollection and no one else's." "[T]he jury [is] presumed to follow the court's directions in the absence of a clear indication to the contrary." (Internal quotation marks omitted.) *State* v. *Russell*, 101 Conn. App. 298, 326, 922 A.2d 191 (2007).

reason for his refusal to testify at the defendant's second trial. The defendant argues that the court's refusal deprived him of a face-to-face meeting with this witness for the prosecution. Alternatively, he claims that if the court's ruling was an evidentiary issue, the court abused its discretion.

The court had been alerted by counsel that Cross, an incarcerated witness, was present in the courthouse, but had indicated that he would refuse to testify. Outside of the jury's presence, the court questioned Cross as to his willingness to testify and informed him of his obligation to do so. Cross became quite disruptive, cursed and stated that he would not say anything. The court, warning Cross that he could be found in contempt of court, did find him in contempt when he continued to refuse to testify and continued to be disrespectful in the courtroom. The court had him physically removed.

Defense counsel requested that Cross be brought back into the courtroom so that he could articulate his refusal to testify in front of the jury. Defense counsel argued that Cross' refusal to testify, in a belligerent and profane manner, would be relevant because it would demonstrate his "violent streak [when] not on angel dust. And the jury could then think, [if] this is the way he is in court or was in court; what was he like on the street on October 9, 2001?" Defense counsel further objected to the reading of Cross' testimony from the first trial by the prosecutor.

Defense counsel presented no legal authority supporting his request. The court recessed for a short time to research the issue and, when it reconvened, indicated that it found no authority for such a request. The court had the jury brought into the courtroom and indicated that Cross was an unavailable witness because he refused to testify. The court further indicated that Cross had testified in September, 2003, and had been cross-examined at that time, and that the law permitted that

former testimony to be used in lieu of the testimony of an unavailable witness.

The court's denial of the defendant's request to require Cross to state in front of the jury his refusal to testify at the defendant's trial was not a violation of the defendant's constitutional right of confrontation. "[T]he state's use of hearsay evidence against an accused in a criminal trial is limited by the confrontation clause of the sixth amendment. . . . The sixth amendment to the constitution of the United States guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him. This right is secured for defendants in state criminal proceedings. . . . [T]he primary interest secured by confrontation is the right of cross-examination. . . .

"Traditionally, for purposes of the confrontation clause, all hearsay statements were admissible if (1) the declarant was unavailable to testify, and (2) the statement bore adequate indicia of reliability. *Ohio* v. *Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). . . . [H]owever, the United States Supreme Court [subsequently] overruled *Roberts* to the extent that it applied to testimonial hearsay statements. See *Crawford* v. *Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). . . . The court held [in *Crawford*] that such testimonial hearsay statements may be admitted as evidence against an accused at a criminal trial only when (1) the declarant is unavailable to testify, and (2) the defendant had a prior opportunity to cross-examine the declarant." (Citations omitted; internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 712–13, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006).

Here, the testimony at issue, Cross' testimony at the defendant's first trial, is clearly testimonial hearsay evidence. Accordingly, the confrontation clause would bar

the state's use of such testimony unless Cross was unavailable to testify at the defendant's second trial, and the defendant had a full and fair opportunity to cross-examine Cross at the defendant's first trial. The defendant does not contest the fact that Cross was unavailable because of his refusal to testify.[15] Further, although defense counsel indicated that he would like the opportunity to cross-examine Cross again, he did not contest the fact that he had a full and fair opportunity to cross-examine Cross at the defendant's first trial. Both the direct examination and the cross-examination of Cross were read to the jury at the defendant's second trial. Accordingly, we conclude that the court's ruling did not deprive the defendant of his constitutional right to confrontation.

For those reasons, we conclude that the court's ruling, which permitted the admission of Cross' testimony without first requiring him to articulate before the jury his refusal to testify, was an evidentiary ruling. "The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Citation omitted; internal quo-

---

[15] "In determining whether the declarant is unavailable, we employ the definitions set forth in rule 804 (a) of the Federal Rules of Evidence." *State v. Schiappa*, 248 Conn. 132, 141–42, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999). Rule 804 of the Federal Rules of Evidence provides in relevant part: "(a) Definition of unavailability. 'Unavailability as a witness' includes situations in which the declarant . . . (2) persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so . . . ." Fed. R. Evid. 804 (a) (2).

tation marks omitted.) *State* v. *LaVallee*, 101 Conn. App. 573, 578, 922 A.2d 316 (2007).

We conclude that the court did not abuse its discretion in denying the defendant's request. Cross was called as the state's witness. The court indicated that the defendant could subpoena Cross and have him testify on behalf of the defendant but that there was no authority to require him to articulate his reason for refusing to testify as the state's witness. The defendant did not call Cross as his witness. Further, the court had serious concerns about security.[16] Cross had been totally uncooperative and had been disrespectful to the court, which found him in contempt. Under those circumstances, with no legal authority whatsoever to support such a request, we cannot conclude that the court's ruling was an abuse of discretion.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[16] The court stated: "I don't believe that I can keep him on the [witness] stand, in control, for the length of time to have his testimony read. So, I think that's—while—I mean, give me a scenario for managing Mr. Cross, who is a large, hard to control individual, who has been convicted of murder, if I remember."