STATE OF CONNECTICUT *v.* TROY MCCARTHY
(AC 28452)

Flynn, C. J., and Lavine and West, Js.

Argued October 24, 2007—officially released February 5, 2008

*George G. Kouros*, special public defender, with whom, on the brief, were *Richard A. Reeve, Michael O. Sheehan* and *Cyd O. Oppenheimer*, special public defenders, for the appellant (defendant).

*John A. East III*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, former state's attorney, and *David L. Zagaja*, senior assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, C. J. The defendant, Troy McCarthy, appeals from the judgment of conviction, following a jury trial, of one count of murder in violation of General Statutes § 53a-54a. On appeal, the defendant claims that (1) the court improperly denied his motion for a new trial, (2) the court improperly admitted certain impeachment evidence for substantive purposes, (3) the court improperly instructed the jury and (4) he was deprived of a fair trial due to prosecutorial impropriety. We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, are relevant to our resolution of the defendant's claims on appeal. On September 25, 2003, the defendant and the victim, Raymond Moore, were standing near the corner of Westland Street and Garden Street in Hartford, in front of the former Nelson & Son's Market, when they engaged in a physical altercation. After the victim slammed the defendant's body onto

the sidewalk, several people intervened and stopped the fight. The defendant, humiliated, left the scene but stated that he would be back. Later, the defendant returned with a gun, but the victim was not there. A friend of the victim, Robert Ware, and others told the defendant that "it wasn't worth it." The defendant, however, responded that the victim was going to respect him.

Two days later, on September 27, 2003, the victim returned to the area and was standing in front of Nelson & Son's Market speaking with Ware. Ware then went across Westland Street and entered Melissa's Market to buy cigarettes. A homeless woman from the area, Mary Cauley, who was on her way to the C-Town Market on Barbour Street, approached the victim and told him that he should go home to his family. She then continued on her way to the C-Town Market, walking north on Garden Street, where she saw the defendant standing on his front porch. Cauley said hello to the defendant, who instructed her to get out of the way. When she got to the C-Town Market, Cauley heard gunshots.

Upon hearing a gunshot, Ware immediately ran out of Melissa's Market as a second gunshot was fired. Looking up Garden Street, Ware saw the victim falling to the ground and saw the defendant running in the opposite direction carrying a gun. At that same time, Maurice Henry, Chauncey Odum and Tylon Barlow were in a vehicle in the parking lot behind Nelson & Son's Market smoking "blunts."[1] Henry was in the driver's seat. As he began to drive out of the parking lot,

---

[1] "A 'blunt' is a street term used to describe a cigar filled with marijuana, instead of tobacco, and smoked to ingest the drug." *State* v. *Sanchez*, 75 Conn. App. 223, 226 n.1, 815 A.2d 242, cert. denied, 263 Conn. 914, 821 A.2d 769 (2003). Odum testified that in this case the blunts also were laced with phencyclidene, also known as PCP or angel dust. See *State* v. *Santiago*, 103 Conn. App. 406, 409 n.2, 931 A.2d 298, cert. denied, 284 Conn. 937, 937 A.2d 695 (2007).

onto Garden Street, Henry saw the victim walking north. He then saw the defendant emerge from the rear yard of a Garden Street building, carrying a gun. Henry saw the defendant shoot the victim twice.

The defendant was charged with one count of murder, tried by the jury and convicted. He received a total effective sentence of fifty years imprisonment. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court abused its discretion in denying his motion for a new trial on the grounds that the state's case was so weak that the jury's verdict could not be relied on and that the "state's witnesses were so lacking in credibility that the conviction constituted a miscarriage of justice." We note that the defendant does not contend that the state's evidence was insufficient, as a matter of law, to establish guilt beyond a reasonable doubt, which, if true, would entitle him to a judgment of acquittal. Rather, the defendant asserts that the state's case was so weak and incredible that it raises a substantial question regarding the reliability of the verdict. Thus, the defendant claims that he should be granted a new trial because of the serious danger that he was wrongly convicted. See *State* v. *Griffin*, 253 Conn. 195, 200, 749 A.2d 1192 (2000).

The defendant's argument is threefold: (1) the testimony of Ware was grossly discrepant from the physical evidence and was not credible; (2) the testimony of Henry was replete with lies, recantations and inconsistencies, such that it completely was unreliable; and (3) the state's only purpose in calling Cauley, Odum and Raymond Rodriguez to testify was to get the jury to make improper negative inferences on the basis of its disbelief of the witnesses' testimony that they did not see the defendant shoot the victim. After setting forth

our appropriate standard of review, we will consider the arguments related to the testimony of Ware and Henry before considering the argument related to the testimony of Cauley, Odum and Rodriguez.

"The trial court should not set [aside] a verdict . . . where there [is] some evidence upon which the jury [reasonably could have] based its verdict, but [the court should set aside the verdict] where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles, or as to justify the suspicion that [the jurors] or some of them were influenced by prejudice, corruption or partiality. . . . Within these parameters, furthermore, the trial court may set [aside] a verdict even if the evidence was conflicting and there was direct evidence in favor of the party who prevailed with the jury. . . . The authority of the trial court to set aside a verdict that is against the weight of the evidence is grounded in the fact that the action of a jury may be as unreasonable, and as suggestive of being produced by improper influences, in passing upon the credibility of witnesses and in the weighing of conflicting testimony, as in any other respect. It is one of the duties of a judge, in the due performance of his [or her] part in jury trials, to see to it that such influences, apparently operating upon the jury, do not prevail, and manifest injustice thereby be done. . . .

"As [our Supreme Court] repeatedly [has] emphasized, the trial court is uniquely situated to entertain a motion to set aside a verdict as against the weight of the evidence because, unlike an appellate court, the trial [court] has had the same opportunity as the jury to view the witnesses, to assess their credibility and to determine the weight that should be given to their evidence. . . . Indeed, [our Supreme Court has] observed that, [i]n passing upon a motion to set aside

a verdict, the trial judge must do just what every juror ought to do in arriving at a verdict. . . . [T]he trial judge can gauge the tenor of the trial, as [an appellate court], on the written record, cannot, and can detect those factors, if any, that could . . . have influenced the jury [improperly]. . . . Of necessity, therefore, an appellate court's inquiry must focus on whether the trial court abused its broad discretion in acting on a motion to set aside a verdict that allegedly is contrary to the weight of the evidence." (Citations omitted; internal quotation marks omitted.) Id., 200–202.

## A

### 1

### Ware's Testimony

The defendant argues in his brief that "the inconsistencies between Ware's testimony and the physical evidence [were] too great to place any weight on Ware's claimed observations. . . . Given the gross discrepancies between Ware's testimony and the physical evidence, it is doubtful that Ware was even at the scene of the shooting." (Citations omitted.) The state does not dispute that Ware provided discrepant testimony. Rather, it acknowledges that Ware testified that the distance between him and the victim was the same as the distance between the witness stand and the rear door of the courtroom, which measured approximately forty-two feet. This testimony did not coincide with the testimony of three private investigators, who had measured the distance between the corner, in front of Melissa's Market, where Ware alleges he was standing immediately after hearing gunshots, and the place where the victim was shot, which measured more than 300 feet. Although it acknowledges this discrepancy, the state argues that "[t]he private investigators also took photographs of the scene with a thirty-five millimeter camera equipped with a fifty millimeter lens, which

the private investigators alleged would represent what a person with 20/20 vision would [have seen]. . . . The jury had unfettered access to the photographs, in which the defendant claims it is 'impossible' to see the person standing where the victim fell from the front of Melissa's store." (Citations omitted.) Thus, the state maintains that the jury reasonably could have inferred that Ware could have seen the incident even if it had occurred from a distance that was farther away than Ware had estimated.

The defendant further challenges Ware's testimony because it took Ware two years to come forward as a witness, despite his close friendship with the victim. The defendant also points out that Ware claimed to have gotten into his vehicle almost immediately after the shooting and to have driven west on Westland Street. Yet, Officer Peter Cricco of the Hartford police department, who immediately responded to the gunshots, testified that he drove east on Westland Street immediately after the shooting and that he did not see any vehicle leave the intersection and travel west down Westland Street. The defendant argues that not only was Ware's testimony not credible, it was not physically possible for him to have seen much of what he said he witnessed.

We are mindful that a verdict based on physical impossibilities should be set aside. "One cogent reason for overturning the verdict of a jury is that the verdict is based on conclusions that are physically impossible. [A] verdict should be set aside [w]here testimony is thus in conflict with indisputable physical facts, the facts demonstrate that the testimony is either intentionally or unintentionally untrue, and leave no real question of conflict of evidence for the jury concerning which reasonable minds could reasonably differ." (Internal quotation marks omitted.) *State* v. *Whipper*, 258 Conn. 229, 247, 780 A.2d 53 (2001), overruled in part on other

grounds by *State* v. *Cruz*, 269 Conn. 97, 106, 848 A.2d 445 (2004). However, in this case, we are not convinced that Ware could not have seen the victim fall to the ground and the defendant run in the opposite direction from the front of Melissa's Market.

Ware testified that he ran out of Melissa's Market when he heard gunshots. He admitted that there was chaos after the shooting and that sixty or seventy people were running around, but he testified that he "had tunnel vision at that time" and saw the victim coming toward him and falling down. He also saw the defendant, with a gun, running in the opposite direction. He testified that he was "100 percent positive" of what he saw that day. Our Supreme Court has instructed that "[w]hen determining whether a witness had sufficient time to observe a defendant to ensure a reliable identification . . . a good hard look will pass muster even if it occurs during a fleeting glance. . . . In particular . . . a view of even a few seconds may be sufficient for a witness to make an identification . . . and . . . it is for the trier of fact to determine the weight to be given that identification." (Internal quotation marks omitted.) *State* v. *Davis*, 283 Conn. 280, 331, 929 A.2d 278 (2007). In this case, the jury heard the positive identification testimony of this witness, observed his demeanor and saw the area photographs. The court did the same. Despite the fact that Ware was more than 300 feet from the shooting, we cannot say that it would have been physically impossible for him to identify the victim and the defendant, with whom he was very familiar, from such a distance.

2

Henry's Testimony

The defendant argues that Henry repeatedly lied on the witness stand, recanted his testimony and continually provided inconsistent testimony, which rendered

everything he said incredible. The state does not contest the defendant's argument that Henry lied about certain things while on the witness stand, but it argues, nonetheless, that Henry witnessed the shooting and that it was within the province of the jury to believe or disbelieve his testimony.

In reviewing the denial of a motion for a new trial on the basis of a claim of lack of credibility, "[w]e assume that the jury credited the evidence that supports the conviction if it could reasonably have done so. Questions of whether to believe or to disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *Felder*, 95 Conn. App. 248, 263, 897 A.2d 614, cert. denied, 279 Conn. 905, 901 A.2d 1226 (2006).

The defendant points out that Henry repeatedly lied about being employed, which the state does not contest. Henry testified repeatedly that he currently was employed by United Parcel Service (UPS) and that he had been employed by that company for three years. The employer services supervisor of UPS, however, testified that Henry had worked for the company from only April 10 to July 30, 2001. It is axiomatic, however, that if the jury determines that a witness lied in some part of his testimony, it may still determine that another part of his testimony was worthy of credit.

The defendant also points to several recantations and story changes made by Henry, which, he argues, further demonstrate that the entirety of Henry's testimony lacked credibility. He directs us to the fact that despite having given a witness statement to the police, Henry

later told investigators from the public defender's office that he had not witnessed the shooting. Henry also signed a statement prepared by a private investigator hired by the defendant stating that he did not see the shooting. Then, at trial, Henry initially denied that he had signed this statement but conceded later that, although it was his signature, he had not read the statement before signing it.

The state does not attempt to dispute that Henry lied and changed his story while on the witness stand. The jury, however, was aware of these fabrications, recantations and inconsistencies, and the assessment of a witness' credibility is a function of the jury, not of an appellate court. "[I]t is beyond question that the trier of fact, here, the jury, is the arbiter of credibility. This court does not sit as an additional juror to reconsider the evidence or the credibility of the witnesses." *State v. Rivera*, 74 Conn. App. 129, 136, 810 A.2d 824 (2002). Additionally, we note that in ruling on the motion for a new trial, the court specifically stated that it, too, would have found the defendant guilty on the basis of the evidence presented. Although we do recognize the inconsistencies in Henry's testimony and how it differs from the testimony of Ware,[2] it is not within the scope of our authority to assess for ourselves the credibility of the witnesses.

Additionally, we note that the court specifically charged the jury that it was "entitled to accept any testimony which [it] believ[ed] to be true, and to reject, either wholly or in part, the testimony of any witness [it]

[2] For example, Ware testified that when he heard gunshots, he ran out of Melissa's Market and that the victim still was on his feet, coming toward him, and that the victim then fell down. At that same time, he also saw the defendant running in the opposite direction, carrying a gun. Henry testified that he saw the defendant shoot the victim once, and the victim immediately fell to the ground. The defendant then shot a second time before turning and running away.

believ[ed] [had] testified untruthfully or erroneously." Certainly, the jury could have believed portions of both testimonies or it could have believed one of them and not the other. We have no way of making such a determination. Further, it is clear from the court's statement that it would have found the defendant guilty, that it also took a fresh look at the evidence and the credibility of the witnesses and determined, for itself, that the defendant was guilty before denying the motion for a new trial.

## B

### The Testimony of Cauley, Odum and Rodriguez

The defendant next argues that "[n]one of the testimony provided by Cauley, Odum or Rodriguez would have been sufficient to obtain a conviction against the defendant. Each of these witnesses denied seeing the shooting, and none implicated the defendant." The defendant further contends that "it was clear that the state called these witnesses in the hopes that their denials would be disbelieved by the jury." The defendant continues: "The state tried its case, in part, by inviting the jury to infer contrary facts from the witnesses' denials—that is, an inference that these individuals did, in fact, have information implicating the defendant. A fact finder's right to reject or credit all or part of a witness' testimony, however, does not extend to the finding of a fact directly contrary to that to which the witness testified."

The state points out the following testimony related to these three witnesses: Cauley testified that as she walked by the defendant standing on his porch, he instructed her to get out of the way. Shortly thereafter, she heard gunshots. Odum testified that Rodriguez approached Henry's vehicle, where he, Barlow and Henry were smoking marijuana blunts and that Rodriguez told them to "look at this." Odum then heard the

gunshots but did not see anything because he was slumped down in the backseat of Henry's vehicle. The men quickly drove out of the parking lot and past the shooting victim. Rodriguez testified that he spoke to the men in Henry's vehicle but that he did not tell them to "look at this." In its appellate brief, the state does not address the defendant's argument that the state's motive in calling these witnesses merely was to persuade the jury to draw improper negative inferences from the witnesses' denial that they knew something more about the killing.

Our law is clear, "a trier cannot make an affirmative factual finding from testimony that has obviously been rejected. . . . While it would be within the province and right of the [trier of fact] to discredit and reject all or part of [a witness'] testimony or to adopt, as true, one of two or more conflicting statements made by him, this privilege does not extend to the finding of a fact, contrary to that to which he testified . . . . Facts cannot be established by not believing witnesses who deny them." (Citations omitted; internal quotation marks omitted.) *State* v. *Carter*, 196 Conn. 36, 50, 490 A.2d 1000 (1985) (*Shea, J.*, dissenting); see *State* v. *Coleman*, 14 Conn. App. 657, 671, 544 A.2d 194 (while jury may reject witness' testimony, it may not conclude from that rejection that opposite is true), cert. denied, 208 Conn. 815, 546 A.2d 283 (1988).

Our review of the record reveals that Cauley testified that as she was walking down Garden Street to get to the C-Town Market on Barbour Street, she encountered the victim at the intersection of Love Lane, Westland Street and Garden Street. She instructed the victim to go home to his family where she said he belonged because he had been out on the street all weekend. As she continued down Garden Street, she saw the defendant standing on his front porch. When she said hello to the defendant, he said hello back and instructed

her to "move out the way." The defendant's hands were by his side, and he was not holding anything. Cauley continued walking down Garden Street, taking a right onto Risley Street and then a left, to head north, on Barbour Street. When she got to the C-Town Market, she heard two gunshots. She later was questioned by the police and told them that the defendant had instructed her to get out of the way. She also testified during trial that she signed a statement prepared by an investigator working for the defendant that was untrue. She further testified that she did not see who shot the victim and that she had no information concerning his death.

Odum testified that he was in a vehicle parked in a parking lot on Garden Street at the time of the victim's death with Henry and "his boy," P. When asked by the prosecutor if he knew P's real name, Odum said that he did not know it. When pressed, he stated that the prosecutor told him that P's real name was Todd Barlow. The prosecutor then produced a letter that Odum had sent from the MacDougall-Walker Correctional Institution addressed to Tylon Barlow. Odum then stated that he learned Barlow's name "after y'all came to see me a couple of times" and that he had obtained Barlow's address from a friend.

Odum testified that he, Henry and Barlow were "getting high, smoking" phencyclidene, also known as PCP, while in the vehicle, parked in the middle of the parking lot, when they were approached by Rodriguez. Rodriguez told the men to "look at this" as he looked up Garden Street. Odum, however, was slouching in the back of the vehicle and did not look. He was "pretty high" at that point. The three men had smoked two and one-half "pieces." Odum heard a couple of gunshots but did not see anything until Henry drove out of the parking lot, heading north on Garden Street, where Odum then saw the victim on the ground, sitting, leaning

on a car. He stated that the victim, at that time, still was alive. Although the vehicle left the parking lot immediately after the shooting, Odum stated that he did not see the defendant in the area, and he did not know where Rodriguez had gone after speaking with them. On redirect, the prosecutor asked Odum how he had been affected by smoking three "pieces," and Odum responded: "I know I was seeing somebody get shot, I would'a—I know that."

Rodriguez testified that he was approached by a vehicle coming from the direction of Melissa's Market. In that vehicle was Odum, Henry and another person whom he did not know. The vehicle stopped, and he spoke briefly with its occupants. When asked by the prosecutor, Rodriguez repeatedly denied telling the occupants to "look at what's gonna happen." He also denied seeing the victim in the area around this time. Rodriguez testified that after exchanging some small talk with the occupants of the vehicle, he walked to Melissa's Market, where he heard gunshots. He then jogged from the store to see what had happened. Rodriguez stated that he knew the defendant but was not friends with him; he merely saw him around, going to work or to school, and he did not see him in the area the day of the shooting.

The defendant argues that these three witnesses were called by the state solely for the improper purpose of proof by negative inference. He argues: "Rather than simply call Henry and Ware to offer what the state claims was sufficient affirmative, probative evidence of [the defendant's] guilt, the state called witness after witness to the [witness] stand for the sole purpose of having them *deny* that they had seen the shooting or had any information establishing [the defendant's] guilt. As the state made explicit in its closing argument, its hope was that the jury would conclude that these denials lacked credibility and thus infer that the witnesses

simply did not want to admit that they had seen [the defendant] commit the offense. . . . [A]bsent such negative inferences, the state's case relied entirely on two witnesses—Maurice Henry and Robert Ware— whose testimony was rife with inconsistencies, contradicted by the physical evidence, and, in at least one instance, was demonstrably perjurious." (Citations omitted; emphasis in original.) We are not persuaded.

First of all, Ware and Henry both provided testimony placing the defendant at the scene of the murder. Henry testified that he actually saw the defendant shoot the victim, and Ware testified that he saw the defendant running from the scene carrying a gun immediately after the gunshots were fired. This testimony alone provided enough evidence to support a conviction. Cauley's testimony supported the proposition that the defendant was outside at or near the time of the murder. She also testified that the defendant told her to move out of the way. As for the testimony of Odum and Rodriguez, there is no indication in the record that the prosecutor's purpose in calling them as witnesses was to get the jury to believe the opposite of their testimony, and this is not something about which we can speculate. There is no indication in the record to which the defendant has directed us that demonstrates that the prosecutor knew exactly what Odum would say or that the prosecutor merely was attempting to bolster the case against the defendant by getting the jury to draw negative inferences regarding the testimony of these witnesses. Further analysis regarding Rodriguez' testimony can be found in our discussion of the defendant's next claim, contained in part II.

II

The defendant next claims that the court abused its discretion in admitting the testimony of Detective Deborah Scates over his objection. He argues that the court

improperly allowed the state to call Scates to the witness stand for the sole purpose of introducing statements made by Rodriguez for substantive purposes. He argues that the primary reason the state called Rodriguez to the witness stand was to impeach him with the subsequent testimony of Scates, which should not have been permitted. The state argues that this testimony was admitted properly for the limited purpose of testing Rodriguez' credibility. In the alternative, the state argues that even if admitting this testimony was improper, it was harmless error. We agree with the defendant that the testimony was improper. Nevertheless, we further conclude that it was harmless.

A

"To the extent a trial court's admission of evidence is based on an interpretation of the [Connecticut] Code of Evidence, [an appellate court's] standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. They require determinations about which reasonable minds may not differ; there is no 'judgment call' by the trial court, and the trial court has no discretion to admit hearsay in the absence of a provision providing for its admissibility. . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion. . . . In other words, only after a trial court has made the legal determination that a particular statement is or is not hearsay, or is subject to a hearsay exception, is it vested with the discretion to admit or to bar the evidence based upon relevancy, prejudice, or other legally appropriate grounds related to the rule of evidence under which admission is being sought." (Citations omitted.) *State v. Saucier*, 283 Conn. 207, 218–19, 926 A.2d 633 (2007).

The following additional facts are necessary for our consideration of the defendant's claim. As outlined in part I B, Rodriguez testified that he did not see the victim before the shooting and had not seen the defendant at all that day. He also denied telling Henry, Odum and Barlow to look at what was going to happen. Rodriguez additionally testified that after jogging to the scene from Melissa's Market, he crossed the yellow police line in order to go into his home, which also was on Garden Street. He stated that he said nothing to those around him but that a female police officer asked him for identification, which he provided before going into his house. Immediately after this testimony, the state called Scates to the witness stand. Scates' testimony was centered on whether Rodriguez had said anything before going into his house. She stated, contrary to Rodriguez' testimony that he said nothing, that Rodriguez had been speaking loudly to those around the scene, telling them "not to work with the police, [not to] talk to the police, [not to] tell the police anything," and that he was causing an uproar. Following Scates' testimony, the court instructed the jury that the inconsistent statements were not to be used "for any other purpose but for the credibility of Mr. Rodriguez." The defendant claims that the court abused its discretion in allowing Scates to testify as to the content of Rodriguez' statements. We agree.

"[T]he credibility of a witness may be impeached by the party calling [the witness] without a showing of surprise, hostility or adversity. A party may impeach his own witness in the same manner as an opposing party's witness and may demonstrate the witness' bias or bad character for veracity and may impeach the witness using prior inconsistent statements. . . . By this holding, however, [our Supreme Court] did not mean to intimate that a state's attorney enjoys unfettered discretion in calling a witness and impeaching

[his] credibility by use of inconsistent statements. The prosecution may not use a prior inconsistent statement under the guise of impeachment for the primary purpose of placing before the jury evidence [that] is admissible only for credibility purposes in hope that the jury will use it substantively. . . . [Our Supreme Court has] established a two-pronged test for the application of the principles [it] adopted in *State* v. *Graham*, [200 Conn. 9, 18, 509 A.2d 493 (1986)]. The introduction of the [prior inconsistent] statement is improper . . . where the primary purpose of calling the witness is to impeach him and the state's attorney introduces the prior inconsistent statement in hope that the jury will use it substantively." (Citations omitted; internal quotation marks omitted.) *State* v. *Williams*, 204 Conn. 523, 530–31, 529 A.2d 653 (1987).

First, we agree with the defendant that the record suggests that the state called Rodriguez for the primary purpose of impeaching him with Scates' subsequent testimony. Rodriguez had no testimony to offer regarding what had occurred at the murder scene, and he had told police that he had not seen the victim or the defendant that day. He further testified that he said nothing to those around him when he crossed the police line in an attempt to go home. His testimony provided nothing useful to the state in proving that the defendant intentionally had killed the victim.

Second, the record supports the defendant's claims that Rodriguez' alleged statements were introduced in the hope that the jury would use them substantively. The state called Scates to testify not only that Rodriguez did say things after he crossed the police line, but also to testify about the specifics of what she alleged Rodriguez had said. Testimony from Scates that Rodriguez had been speaking loudly to the crowd would have impeached his testimony that he had said nothing. The alleged content of what Rodriguez had said—"don't talk

to the police, don't tell the police anything"—should not have been placed before the jury because it could have been used by the jury for substantive purposes, which went beyond any allowable impeachment evidence.[3]

## B

Having concluded that the court abused its discretion in permitting Scates to testify as to the content of what Rodriguez was yelling to the crowd, we next consider whether the defendant met his burden of proving that the improper admission of the testimony was harmful. "[A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Sawyer*, 279 Conn. 331, 357, 904 A.2d 101 (2006) (en banc). "[W]hether [the improper admission of a witness' testimony] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) Id., 358.

The defendant argues that Scates' testimony went well beyond impeaching Rodriguez; it was meant to

---

[3] In this context, the defendant also argues that the state clearly wanted the jury to use Rodriguez' alleged statements for substantive purposes, "to disbelieve his denials and draw the contrary inference that he was hiding inculpatory information about the murder." He refers to the following argument the prosecutor made to the jury: "Raymond Rodriquez, did he see more than he testified to? Answer that question relative to why he would be mouthing off in a crowd of others saying, 'Don't tell the police anything,' when he was approached by Detective Scates."

explain to the jury why the witnesses, who testified that they did not see the defendant shoot the victim, testified as they did, and that this, coupled with the incredible testimony of the two "eyewitnesses," greatly impacted the result of the trial. The defendant further argues that "[i]n order to bolster its case, the state made the strategic decision to call witnesses who would deny having knowledge about the shooting, in the hope that the jury would disbelieve those denials and infer that the witnesses were 'hiding the truth,' " and that this is evidenced by the state's closing arguments telling the jury that the witnesses knew more than they admitted.[4] The defendant contends that "Scates' testimony was thus not a minor moment in the trial, but rather was an integral part of the state's 'proof by negative inference' strategy," and the court's one limiting instruction was not adequate to alleviate the harm caused by the testimony.

In this case, Rodriguez testified that he did not see who shot the victim and that he had no testimony of importance to the case. Scates' testimony that Rodriguez told the crowd not to talk to the police, while improperly admitted, also was not crucial to this case. The defendant has directed us to nothing that would demonstrate that this impropriety was crucial to the successful prosecution of this case or that it caused him to suffer substantial prejudice. Although we agree that the admission of these statements allegedly made by Rodriguez improperly could have led the jury to accept this as the explanation of why so many witnesses stated that they did not have any crucial information on the shooting, the defendant, nonetheless, cannot get beyond the hurdle that there was one witness who

---

[4] The defendant refers to the statements by the prosecutor regarding Rodriquez' seeing "more than he testified to" as well as other statements made by the prosecutor during closing argument regarding Cauley seeing "more and not admit[ting] it."

specifically saw him pull the trigger and another witness who saw him running from the scene, carrying a gun, immediately after the gunshots were fired. Because of this evidence, we have a fair assurance that the improper admission of this testimony did not substantially affect the verdict.

## III

The defendant next claims that the court's jury instructions were improper in several ways: the court failed to give the requested charge to the jury that mere disbelief of a witness' denial of a fact does not constitute evidence that the fact in question is true; the court improperly charged the jury that "the state does not want to see the innocent convicted"; and the court improperly charged the jury on the definition of reasonable doubt.[5]

Our standard of review regarding properly preserved claims of improper jury instructions is well settled. "In reviewing claims of instructional [impropriety], we seek to determine whether it was . . . reasonably possible that the jury was misled by the trial court's instructions . . . . [T]he charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation

---

[5] The defendant preserved these claims of improper jury instructions by filing a request to charge and by taking exceptions to the charge as given.

marks omitted.) *State* v. *Martinez*, 278 Conn. 598, 608, 900 A.2d 485 (2006). "Although [a] request to charge which is relevant to the issues of [a] case and which is an accurate statement of the law must be given . . . [a] refusal to charge in the exact words of a request . . . will not constitute error if the requested charge is given in substance. . . . Thus, when the substance of the requested instructions is fairly and substantially included in the trial court's jury charge, the trial court may properly refuse to give such instructions." (Internal quotation marks omitted.) *State* v. *Ledbetter*, 263 Conn. 1, 22, 818 A.2d 1 (2003). With this standard in mind, we review each of the defendant's claimed improprieties.

A

The defendant claims that the court improperly failed to charge the jury in accordance with his request that mere disbelief of a witness' denial of a fact does not constitute evidence that the fact in question is true. Additionally, he points out that the court initially agreed to give the charge but then declined to do so. He argues that on the facts of this case, in which so many of the state's witnesses denied seeing or having knowledge of the shooting, he was entitled to the requested charge because it was correct in law and relevant to the issues of this case.[6] We disagree.

---

[6] The defendant also argues that he was entitled to this charge because it pertained to his "reasonable doubt" defense, and a defendant is entitled to have instructions that relate to his theory of defense. We can find nothing to support the defendant's assertion that "reasonable doubt" can be a theory of defense, nor does he provide any support for this assertion. Black's Law Dictionary (7th Ed. 1999) defines "reasonable doubt" as: "The doubt that prevents one from being firmly convinced of a defendant's guilt, or the belief that there is a real possibility that a defendant is not guilty. 'Beyond a reasonable doubt' is the standard used by a jury to determine whether a criminal defendant is guilty. In deciding whether guilt has been proved beyond a reasonable doubt, the jury must begin with the presumption that the defendant is innocent." Accordingly, we consider this claim evidentiary and not constitutional.

The defendant specifically requested that the court instruct the jury as follows: "If a witness denies a fact, and you disbelieve that denial, your disbelief does not constitute evidence that the fact in question is indeed true. A fact can only be proven with either direct or circumstantial evidence about the existence of that fact. You cannot establish a fact merely from your disbelief of a witness' denial. For example, if a witness denies that a traffic light was red, and you disbelieve that witness, you cannot find that the traffic light was indeed red based on your disbelief alone. You can only find that the light was red if there was other evidence presented that the light was indeed red."

The court declined to give the requested charge stating, in part, that although the charge was correct in law, "[t]he problem . . . is that we've got layers and layers of disbelief. . . . The jury certainly can't jump from that to the fact that [the defendant] is the shooter, but they can say, 'I think he saw something. That's all.' So, I'm not going to give that request." The state argues that the court's instruction was proper when viewed in its entirety and, even if it was improper for the court to refuse to give the requested instruction, it was harmless beyond a reasonable doubt because there is no reasonable possibility that the jury was misled.

The defendant relies on cases such as *State* v. *Coleman*, supra, 14 Conn. App. 671–72, in which we stated that "[i]t is axiomatic under Connecticut law that, while a [trier of fact] may reject a defendant's testimony, a [trier of fact] in rejecting such testimony cannot conclude that the opposite is true. . . . Thus, under Connecticut law, the [trier of fact] is not permitted to infer, from its disbelief of the defendant's testimony, that any of the facts which he denied were true." (Citations omitted; internal quotation marks omitted.) Id.; see also *State* v. *Hart*, 221 Conn. 595, 604–606, 605 A.2d 1366 (1992) (Connecticut has rule barring inference opposite

of testimony); *State* v. *Carter*, supra, 196 Conn. 50 (*Shea, J.*, dissenting) (trier of fact cannot make affirmative factual finding from disbelief of testimony); *State* v. *Mayell*, 163 Conn. 419, 426–27, 311 A.2d 60 (1972) (jury cannot make affirmative factual finding from disbelief of concocted alibi testimony of defendant). Such cases, however, are distinguishable from the present case.

*Coleman* was not a case in which the court refused to give the jury an instruction on opposite inference. Rather, the court gave an improper instruction on opposite inferences by telling the jury that it could infer that the opposite was true solely on the basis of its disbelief of a denied factual allegation. *State* v. *Coleman*, supra, 14 Conn. App. 673. *Coleman* is inapposite to the case at hand. *Carter* also is distinguishable from the present case. In *Carter*, Justice Shea, dissenting, concluded that the jury had used opposite inferences to arrive at its verdict and that the evidence was insufficient; the majority, however, had concluded otherwise. *State* v. *Carter*, supra, 196 Conn. 36.

In *Mayell* and in *Hart*, our Supreme Court concluded that the evidence had been insufficient and that the use of opposite inferences was improper. *State* v. *Hart*, supra, 221 Conn. 604–606; *State* v. *Mayell*, supra, 163 Conn. 426–27. Further, in *Hart*, our Supreme Court explained that "[o]ur rule barring the inference of the opposite of testimony has been applied uniformly in both criminal and civil contexts. . . . It is an evidentiary issue concerning the proper method of measuring the sufficiency of the evidence." *State* v. *Hart*, supra, 605–606. None of the cases cited by the defendant, however, stands for the proposition that a court is required to give an opposite inference charge when requested to do so by the defendant.

The situation presented in this case has been addressed previously by this court. In *State* v. *Thomas*,

50 Conn. App. 369, 717 A.2d 828 (1998), appeal dismissed, 253 Conn. 541, 755 A.2d 179 (2000), the defendant also had claimed instructional error in the court's refusal to give an opposite inference charge. In *Thomas*, this court determined that there was no requirement to support the proposition that "a trial court must, or even may, instruct the jury that it cannot . . . use its disbelief of a witness' testimony as affirmative proof of the opposite." Id., 380–81; see also *State* v. *Smith*, 92 Conn. App. 579, 583–84, 886 A.2d 484 (2005) (same), cert. denied, 277 Conn. 908, 894 A.2d 990 (2006). Accordingly, we reject the defendant's claim.

B

The defendant next claims that the court improperly charged the jury that "the state does not want to see the innocent convicted." The defendant took an exception to this part of the charge, citing *State* v. *Wilson*, 71 Conn. App. 110, 800 A.2d 653, cert. denied, 262 Conn. 905, 810 A.2d 272 (2002). He argues that the trial courts repeatedly have been instructed not to use this language, and he further argues that these warnings have not "sufficiently impressed the trial courts to effect a change in their behavior . . . ." Accordingly, he requests that we "should exercise [our] supervisory authority to require reversal in this case, or, in the alternative, should rule that the trial court's decision to give the challenged instruction was plain error warranting reversal." The state agrees that this instruction is "disfavored" but argues, nonetheless, that there was no constitutional violation or plain error because the court's instruction, when viewed in its entirety, adequately apprised the jury that the defendant was entitled to the presumption of innocence unless the state proved his guilt beyond a reasonable doubt. We agree with the state.

We begin by reviewing the instructions at issue. After instructing the jury on the presumption of innocence,

the state's burden of proof and the essential elements of the crime charged, the court gave the following instruction: "At the same time, the state of Connecticut and its people also justly rely upon you to consider carefully its claims, to consider carefully all the evidence, and to find the defendant guilty if the facts and the law requires such a verdict. The state rightfully expects fair and just treatment from you. *The state does not want the conviction of innocent persons or of any person of whose guilt upon the evidence there is reasonable doubt.* But for the safety and the well-being of society and the protection of life and property, the state is concerned in securing the conviction of persons who have been proven by the evidence beyond a reasonable doubt to be guilty of committing the crime charged in this information." (Emphasis added.)

The defendant claims that the court's instruction undermined the presumption of innocence and the state's burden of proof by "suggest[ing] that the prosecutor would not be asking the jury to convict the defendant unless the prosecutor believed that the defendant was guilty." Our appellate courts previously have addressed similar challenges to this type of instruction, and, although finding them improper, nevertheless, have found them harmless because "[t]he court did not instruct that the state prosecutes only guilty people, but rather that the state requires the conviction of only the guilty. *State* v. *Allen*, 28 Conn. App. 81, 85, 611 A.2d 886, cert. denied, 223 Conn. 920, 614 A.2d 826 (1992); id., 84 (no reasonable possibility that jury was misled by trial court's instruction that [t]he state does not desire the conviction of innocent people or of any person whose guilt upon the evidence is in the realm of reasonable doubt)." (Internal quotation marks omitted.) *State* v. *Lawrence*, 282 Conn. 141, 180, 920 A.2d 236 (2007).

Additionally, in this case, the court repeatedly instructed the jury that it was the state's burden to prove the defendant guilty beyond a reasonable doubt. The court instructed the jury in relevant part: "In this case, as in all criminal cases, the accused . . . is presumed to be innocent until he is proven guilty. That means, at the moment when he was presented before you for trial, he stood before you free of any bias, prejudice or burden arising from his position as the accused. Nothing you might know or guess about his past should be considered by you at all. Insofar as you're concerned, he was then innocent, and he remains innocent until such time as the evidence and matters produced here, right in this very courtroom and in the course of this trial, satisfy you that he's guilty. . . . The burden, then, is on the state to prove the accused guilty of the crime with which he's charged, and he, the accused, does not have to prove his innocence. The law presumes a defendant to be innocent of crime. Thus, a defendant, although accused, begins the trial with a clean slate, if you will, with no evidence against him. And the law permits nothing but legal evidence presented before the jury to be considered in support of any charge against the accused. So, the presumption of innocence alone is sufficient to acquit a defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt, after careful and impartial consideration of all the evidence in this case.

"This means that the state must prove every element necessary to constitute the crime charged . . . . The state's burden of proof is to prove the elements of the crime of murder beyond a reasonable doubt. It's not enough for the state to prove only certain of those elements, because if proof of even one element is lacking, you must find the accused not guilty. The state, in other words, can sustain the burden resting on it only if the evidence before you establishes the existence of

every element constituting the crime charged beyond a reasonable doubt."

Viewing the charge as a whole, we conclude that there is no reasonable possibility that the jury was misled. See *State* v. *Lawrence*, supra, 282 Conn. 179 (even if improper, no reasonable possibility jury misled by court's instruction that " '[t]he state does not want the conviction of any person whose guilt upon the evidence there is a reasonable doubt' "); *State* v. *Marshall*, 83 Conn. App. 418, 430, 850 A.2d 1066 (no reasonable possibility jury misled by court's instruction that " '[t]he state does not desire a conviction of an innocent person or any person whose guilt upon the evidence is in the realm of reasonable doubt [and] [t]he state has as much concern in having an innocent person acquitted as in having a guilty person punished' "), cert. denied, 271 Conn. 904, 859 A.2d 564 (2004); *State* v. *Torres*, 82 Conn. App. 823, 835, 847 A.2d 1022 (no reasonable possibility jury misled by court's instruction that " '[t]he state, as well, does not want the conviction of an innocent person [and] [t]he state is as much concerned in having an innocent person acquitted as in having a guilty person convicted' "), cert. denied, 270 Conn. 909, 853 A.2d 525 (2004); *State* v. *Wilson*, supra, 71 Conn. App. 117–18, 121 (no reasonable possibility jury misled by court's instruction that " '[t]he state is as much concerned in having an innocent person acquitted as in having a guilty person convicted' "); *State* v. *Tyson*, 43 Conn. App. 61, 68, 682 A.2d 536 (no reasonable possibility jury misled by court's instruction that " 'the state does not want the conviction of innocent persons' "), cert. denied, 239 Conn. 933, 683 A.2d 401 (1996).

Agreeing that this instruction was improper, we, nevertheless, conclude that the court's instructions, when viewed as a whole, did not mislead the jury. Certainly, although this particular instruction, when viewed in

isolation, may be "susceptible of an unacceptable interpretation," the instruction was not offered in isolation. See *State* v. *Wilson*, supra, 71 Conn. App. 120. On the basis of our review of the charge in its entirety, we conclude that the instructions adequately informed the jury of the presumption of innocence and the state's burden of establishing the defendant's guilt beyond a reasonable doubt. Accordingly, we are not convinced that the potential danger of misunderstanding was "so significant as to affect the fairness and integrity of or the public confidence in the proceeding, as required for reversal under the plain error doctrine." (Internal quotation marks omitted.) *State* v. *Lawrence*, supra, 282 Conn. 183, quoting *State* v. *Smith*, 275 Conn. 205, 246, 881 A.2d 160 (2005) (trial court's contravention of direction in *State* v. *Schiappa*, 248 Conn. 132, 175, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 [1999], to discontinue use of challenged jury instruction did not merit reversal under plain error doctrine); see also *State* v. *O'Neil*, 67 Conn. App. 827, 837, 789 A.2d 531 (2002) (trial court's contravention of direction in *State* v. *Delvalle*, 250 Conn. 466, 475–76, 736 A.2d 125 [1999], to discontinue use of challenged instruction did not merit reversal under plain error doctrine because instructions did not affect fairness or integrity of proceedings, nor did they result in manifest injustice to defendant).[7]

---

[7] The defendant also requests that we utilize our supervisory powers and reverse the judgment to ensure that the trial court follows the guidance we set forth in *Wilson*. This same claim was made in *State* v. *Lawrence*, supra, 282 Conn. 183 n.26, in which our Supreme Court explicitly rejected the "contention that a per se rule of reversal is required under the plain error doctrine in the absence of manifest injustice in the trial court proceedings. Cf. *State* v. *D'Antonio*, 274 Conn. 658, 681, 877 A.2d 696 (2005) (rejecting per se rule of reversal for violation of prophylactic rule requiring judge to disqualify himself from trial if he previously had presided over plea negotiations)." Reviewing the record, we are not convinced that the court wilfully and intentionally disregarded our holding in *Wilson*, nor are we convinced that a manifest injustice occurred.

In the alternative, the defendant requests that we review this claim under the plain error doctrine. We also decline this invitation. "The plain error

## C

The defendant next claims that the court improperly charged the jury on the definition of reasonable doubt. Specifically, he argues that the court improperly refused to give his requested instruction, instead utilizing an instruction that was likely to mislead the jury. The defendant takes issue with the phrase: "The state does not have to prove guilt beyond all doubt or to a mathematical or absolute certainly" because the only witness who testified that he actually saw the defendant shoot the victim said that he was "80 percent sure" that the defendant was the shooter. We conclude that the court's instruction on reasonable doubt was proper.

The court gave the jury the following instruction on reasonable doubt: "Now, what does that mean, 'beyond a reasonable doubt?' The phrase 'reasonable doubt' has no technical or unusual meaning. We arrive at the real meaning of it by emphasizing the word 'reasonable.' A reasonable doubt is a doubt which is something more than a guess or a surmise. It is not a conjecture or a fanciful doubt. A reasonable doubt is not a doubt which is raised by someone simply for the sake of raising doubts. A reasonable doubt is a doubt based on reason and not on the mere possibility of innocence. It is a doubt for which you can, in your own mind, conscientiously give a reason. A reasonable doubt, in other words, is a real doubt, an honest doubt, a doubt which

doctrine is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . The plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Lawrence*, supra, 282 Conn. 183; see also Practice Book § 60-5.

has its foundation in the evidence or lack of evidence. It is the kind of doubt which, in the serious affairs which concern you in everyday life, you would pay heed and attention to. Now, of course, absolute certainty in the affairs of life is almost never attainable, and the law does not require absolute certainty on the part of the jury before you return a verdict of guilty. The state does not have to prove guilt beyond all doubt or to a mathematical or absolute certainly. What the law does require, however, is that, after hearing all the evidence, if there is something in that evidence or lack of evidence which leaves in the minds of the jury, as reasonable men and women, a reasonable doubt about the guilt of the accused, then the accused must be given the benefit of that doubt and acquitted. If there is no reasonable doubt, then the accused must be found guilty. Proof beyond a reasonable doubt is proof which precludes every reasonable hypothesis except guilt, is consistent with guilt, and is inconsistent with any other reasonable conclusion. If you can, in reason, reconcile all the facts proved with any reasonable theory consistent with the innocence of the accused, then you cannot find him guilty."

Very recently, in *State* v. *Davis*, supra, 283 Conn. 332–37, our Supreme Court approved of an instruction on reasonable doubt that virtually was identical to the one given in the present case, and the defendant has cited no authority to support his argument that where a witness testifies to being less than 100 percent sure, a different result is necessary.[8] Reviewing this charge

---

[8] Our Supreme Court repeatedly has approved of instructions on reasonable doubt that state that a mathematical certainty is not required. See, e.g., *State* v. *Davis*, supra, 283 Conn. 333 n.37 (" '[t]he state does not have to prove guilt beyond all doubt or to a mathematical or absolute certainty' "); *State* v. *Colon*, 272 Conn. 106, 232 n.83, 864 A.2d 666 (2004) (" '[t]he law does not require absolute mathematical certainty' "), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005); *State* v. *Reynolds*, 264 Conn. 1, 104 n.93, 836 A.2d 224 (2003) (" '[t]he state does not have to prove a factor beyond all doubt or to a mathematical or absolute certainty' "), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); *State* v.

as a whole, we conclude that it is not reasonably probable that the jury was misled by the court's instruction on reasonable doubt.

## IV

The defendant's final claim on appeal is that he was deprived of a fair trial because of prosecutorial improprieties. Specifically, he argues that the prosecutor improperly (1) opined on the credibility of witnesses, (2) argued facts not in evidence and (3) misstated the evidence. The defendant contends that the cumulative effect of those improprieties deprived him of a fair trial. We disagree.

## A

"[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. Put differently, [impropriety] is [impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] caused or contributed to a due process violation is a separate and distinct question . . . . As we have indicated, our determination of whether any improper conduct by the state's attorney violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, supra, 204 Conn. 540, with due consideration of whether that [impropriety] was objected to at trial." (Internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 361–62, 897 A.2d 569 (2006).

*Lemoine*, 256 Conn. 193, 202, 770 A.2d 491 (2001) (" '[t]he state does not have to prove guilt beyond all doubt or to mathematical or absolute certainty' "); *State* v. *Whipper*, supra, 258 Conn. 294 n.29 (" 'The state does not have to prove guilt beyond all doubt or to a mathematical or absolute certainty or to an absolute perfect case. Criminal cases are not prosecuted on the basis of evidence that is 100 percent perfect.' ").

Because the alleged impropriety occurred during the state's closing argument, our analysis is guided by the principle that "[w]hile a prosecutor may argue the state's case forcefully, such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Necaise*, 97 Conn. App. 214, 229–30, 904 A.2d 245, cert. denied, 280 Conn. 942, 912 A.2d 478 (2006).

1

The defendant argues that the prosecutor improperly opined on the credibility of several witnesses. We agree that some of the remarks were improper.

"[E]xpressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Put another way, the prosecutor's opinion carries with it the imprimatur of the [state] and may induce the jury to trust the [state's] judgment rather than its own view of the evidence. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 35, 917 A.2d 978 (2007).

The defendant refers to the prosecutor's initial summation in which he discussed Odum, Cauley and Rodriguez, three of the state's witnesses, stating: "I don't know how I called them. And I was going to say something cute like I affectionately call them but I don't affectionately look at those three individuals at all." The defendant did not object to these statements, and our review of them reveals nothing improper.

The defendant also refers to the prosecutor's rebuttal argument in which he stated that defense counsel has

"even spun it around to say I like Chauncey Odum, Raymond Rodriguez and Mary Cauley; please look at them as fine people who should be believed in this instance. I think they're bums. I think the three of them are bums." The defendant objected to the statement made during rebuttal argument, and the court sustained the objection, instructing the jury to disregard the comments because "what counsel thinks is not relevant." Immediately thereafter, the prosecutor continued, stating, "I don't think they're fine people," and the court, sua sponte, commendably interrupted him and admonished: "I instruct you . . . to stop telling the jury what you think. And I instruct the jury to disregard [the prosecutor's] comments about what he thinks about this witness or that witness. You'll decide about the witnesses. He'll argue from the evidence." We agree with the defendant that the prosecutor's two references to these witnesses as "bums" was improper and inappropriate. The term "bum" is pejorative and disrespectful. The American Heritage Dictionary (2d College Ed. 1982) describes a "bum" as "1. a tramp; hobo. 2. A person who avoids work and seeks to live off others." Whether these improper comments deprived the defendant of a fair trial will be analyzed in part IV B.

2

The defendant next argues that the prosecutor improperly argued facts that were not in evidence. First, the defendant argues that the prosecutor improperly sought to attack the defense photographic evidence "by referring to a personal experience of a failed attempt to accurately photograph a bird . . . ."[9] The defendant

[9] The prosecutor began his closing remarks in relevant part: "As you can see, I got some sun this weekend, but I was not out taking pictures to see if they would develop and look the same size as what I took through a camera. It did come to mind, as I saw the evidence and heard the evidence presented by the three individuals from the investigation agency, that a few years ago, in the winter, I woke up and I came downstairs, and I looked out the kitchen window. And it had been snowing, and each twig on the tree was covered with snow. And what I saw in my bird feeder was a

objected to this rhetorical story, and the court sustained the objection, cautioning the prosecutor to "confine [his] argument to the evidence." The defendant then requested a mistrial, which the court denied. After a brief discussion with counsel outside the presence of the jury, the court brought back the jury and instructed: "Counsel are permitted to argue from evidence. And [the prosecutor's] argument, while not badly intentioned, is outside of the evidence, and so I sustained the objection. So, we're just going to start argument all over again. So, just disregard what's gone on before, and we'll start from scratch. And I see from your nods that you're well able to do that." We agree that this argument was improper.

Our Supreme Court repeatedly has instructed that "a prosecutor may not comment on evidence that is not a part of the record and may not comment unfairly on the evidence in the record." *State* v. *Fauci*, supra, 282 Conn. 49. In the present case, the prosecutor attempted to interject his personal disappointment with an automatic focus camera. A review of the record, however, demonstrates that no evidence was adduced at trial to establish that cameras, such as the disposable one used by the investigators for the defendant in this case, produced disappointing results. We, therefore, reject the state's argument that this story was "simply imagery" and conclude that it was improper.

The defendant next argues that the prosecutor improperly "invoked his own inability to accurately estimate distance to minimize the discrepancy between

cardinal, and it was incredible. And as all of you, I'm sure, living up here in the Northeast have seen, a cardinal, a male cardinal, against snow is just stunning. So, I ran and I got a camera, and I wanted to capture that picture. And I thought of capturing the picture and ultimately having it hung somewhere in my apartment. And I took a couple of pictures, took a couple of shots, as he stood there by the bird feeder. And I got them developed, got the pictures developed. I can't tell you what size lens I had in my camera. I think it was a Sure Shot. I call them dummy cameras. This is the age of thirty-five millimeter. And, lo and behold, I was disappointed."

Ware's testimony and the physical evidence introduced by the defense." We disagree that this was improper.

Although it is axiomatic that "[a] prosecutor, in fulfilling his duties, must confine himself to the evidence in the record," this notion is balanced against the premise that "[j]urors are not expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusions correct." (Internal quotation marks omitted.) *State* v. *Rogelstad*, 73 Conn. App. 17, 29–30, 806 A.2d 1089 (2002). A review of the record reveals that the prosecutor merely was appealing to the life experience of the jury.

The defendant also argues that the prosecutor improperly attempted to denigrate the defendant's evidence and to dilute the state's burden of proof by twice referring to the defendant's evidence as a "science project." He argues that this implicitly suggested to the jury that the defendant's "evidence was of the quality of a grade school student's work product." We find no merit to this argument. The prosecutor did not compare the defendant's evidence to a juvenile undertaking.

3

Finally, the defendant argues that the prosecutor improperly misstated the evidence. The defendant argues that the prosecutor, in his rebuttal argument, misstated Ware's testimony and the photographic evidence admitted during trial. We disagree.

"[Our Supreme Court has] held that a prosecutor may not comment on evidence that is not a part of the record and may not comment unfairly on the evidence in the record." *State* v. *Fauci*, supra, 282 Conn. 49. "A prosecutor may invite the jury to draw reasonable inferences

from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. . . . The rationale for the rule prohibiting the state from making such a reference is to avoid giving the jury the impression that the state has private information, not introduced into evidence, bearing on the case." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 587, 849 A.2d 626 (2004).

The defendant complains about the following statements offered by the prosecutor during rebuttal: "But isn't it not true that [defense counsel] constantly and repetitively asked Mr. Ware where he was when he first caught sight of the defendant? And Mr. Ware kept saying, I was running across the street. I was coming across. I was coming across. Well, then, were you in front of this building? No, I wasn't that far, but I was coming across. And then, and then, the first offer, the only photographs offered to these jokers[10] called private investigators are vantage points from Melissa's, the vantage points that Mr. Ware repeatedly said he wasn't at when he saw the defendant."

Although the defendant argues that Ware testified that he was in front of Melissa's Market when he saw the defendant with the gun, a review of the record certainly reveals that Ware's testimony conflicted at various points. Although he stated several times that he was in front of Melissa's Market when he saw the defendant, he also testified that he was making his way across the street when he saw the defendant running away, carrying a gun. Accordingly, we conclude that the prosecutor's statement was a proper argument based on the conflicting evidence.

The defendant also argues that "[a]fter the state's cross-examination of one of the defense investigators

---

[10] We also conclude that this ad hominem attack on the defendant's investigators was highly inappropriate and improper.

regarding exactly this issue, the defense *did* introduce a photograph that showed the vantage point of someone standing in the street rather than directly in front of Melissa's [Market]." (Emphasis in original.) This argument simply is without support. A review of that specific photograph, defendant's exhibit M, depicts the vantage point of someone standing in the street *directly in front of* Melissa's Market. Accordingly, we find the argument that the prosecutor misstated the evidence to be without merit.

B

After determining that there were improprieties in this case, when the prosecutor referred to several witnesses as "bums" and to the defendant's private investigators as "jokers," as well as when he interjected his personal experience with a disappointing automatic focus camera, we now turn to whether those improprieties so infected the trial with unfairness as to make the defendant's conviction a denial of due process. "In order to make this determination we consider the factors [set forth in *State* v. *Williams*, supra, 204 Conn. 540], specifically: the extent to which the [improprieties were] invited by the defendant's conduct or argument, the severity of the [improprieties], the frequency of the [improprieties], the centrality of the [improprieties] to the critical issues in the case, the strength of the curative measures adopted and the strength of the state's case." *State* v. *Camacho*, 282 Conn. 328, 382, 924 A.2d 99, cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007). After examining all of these factors in light of the specific prosecutorial improprieties present in this case, although not condoning the language used, we conclude, nevertheless, that the defendant was not deprived of a fair trial.

First, we conclude that there is nothing in the record to suggest that the improprieties were invited by the

defendant. Second, the few instances of impropriety occurred only in closing arguments. Further, the remarks comprised a relatively small portion of those arguments. Third, we conclude that calling witnesses "bums" and "jokers" is strongly condemnatory, highly inappropriate and disrespectful, and, therefore, severe. We also note that defense counsel *did object* to the prosecutor's use of the term "bums" at trial.

Our fourth consideration is the centrality of the impropriety to the critical issues present in the case. "It is a well established principle that the elements of a crime are critical issues in a state's case." *State* v. *Gordon*, 104 Conn. App. 69, 83, 931 A.2d 939, cert. denied, 284 Conn. 937, 937 A.2d 695 (2007). Here, the prosecutor's characterization of three of its witnesses as "bums" could not be said to relate to the critical issues of the case, nor could the prosecutor's experience with an automatic focus camera. There were two eyewitnesses in this case, one who saw the defendant shoot the victim, and one who saw the defendant running from the scene holding a gun immediately after gunshots were fired. Although we agree with the defendant that this case was a credibility contest, it was the credibility of Ware and Henry, not of these three witnesses, that was critical.

Our fifth consideration requires us to review the curative measures adopted by the court to ameliorate the improprieties. In this case, the defendant did voice an objection to two of the instances of impropriety, and the court immediately admonished the prosecutor and gave curative instructions as quoted in parts IV A 1 and 2 of this opinion. Commendably, the court also, sua sponte, gave a curative instruction and admonished the prosecutor for improper remarks in which he expressed his personal opinion as to the credibility of certain

witnesses. The defendant did not object to the prosecutor's use of the term "jokers" in describing the defendant's private investigators, and the court offered no curative instructions sua sponte.

Our sixth and final consideration is the strength of the state's case, which the defendant argues was very weak. There was evidence that the defendant and the victim had a physical altercation and that the defendant felt disrespected by the victim. The state presented the testimony of Henry, who stated that he saw the defendant shoot the victim. The state also presented the testimony of Ware, who stated that immediately after he heard gunshots, he saw the defendant running from the scene holding a gun. Because these witnesses provided some inconsistent testimony, we agree that this was not an easy case to prove. Nevertheless, we would not characterize it as weak.

Viewing the whole record before us, and after our application of the six *Williams* factors, we conclude that the instances of prosecutorial impropriety in this case did not deprive the defendant of his due process right to a fair trial. Although the prosecutor's use of the terms "bums" to describe three of the state's witnesses and "jokers" to describe the defendant's private investigators was inappropriate, undignified and degrading to the process, the court's admonishments and its instructions to the jury, including its instructions and admonishments related to the prosecutor's comments regarding his experience with an automatic focus camera, when viewed in light of the other *Williams* factors, were sufficient to cure any potential harm caused by the prosecutorial impropriety. Accordingly, we conclude that the defendant was not deprived of his due process right to a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.